## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

OLATUNJI KEAN,

                    Petitioner,

v.                                                    Case Number: 07-CV-14650
                                                      Honorable Nancy G. Edmunds
JAN TROMBLEY,

                    Respondent.
_____/

### OPINION AND ORDER DENYING PETITION FOR WRIT OF
### HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF
### APPEALABILITY AND LEAVE TO PROCEED ON APPEAL _IN FORMA PAUPERIS_

## I. INTRODUCTION

This is a habeas case filed under 28 U.S.C. § 2254.  In June 2005, a Saginaw County, Michigan, circuit court jury convicted Petitioner, Olatunji Kean, a state inmate currently incarcerated at the Gus Harrison Correctional Facility in Adrian, Michigan, of bank robbery, MICH.COMP.LAWS § 750.531(a), and fleeing and eluding a police officer, MICH.COMP.LAWS § 750.479(a)(3).  He was sentenced, as a habitual offender, third, MICH.COMP.LAWS § 769.11, to serve concurrent terms of eight-and-one-half to twenty years in prison for the bank-robbery conviction and three to ten years in prison for the fleeing-and-eluding conviction.  Kean appealed his convictions and sentences; the Michigan Court of Appeals subsequently vacated his fleeing-and-eluding conviction and remanded the case for resentencing.  On remand, he was resentenced to the same sentence, eight-and-one-half to twenty years in prison.  In his habeas petition, Kean challenges his state convictions and sentences on the following grounds: ineffective assistance of counsel for failing to present a defense, for conceding his guilt, and for failing to object to his being shackled and

gagged in front of the jury.  For the reasons stated below, the Court denies the petition. The Court also declines to issue a certificate of appealability and leave to proceed on appeal *in forma pauperis*, as any appeal would be frivolous.  Fed.R.App. 24(a).

## II.  SUBSTANTIVE FACTS

Kean was originally charged with three felonies; (1) bank robbery, (2) armed robbery, and (3) third-degree fleeing and eluding a police officer.  Those charges arose from an event which occurred at a bank in Saginaw, Michigan, on September 24, 2004.

At the inception of this case, on October 4, 2004, Attorney George Bush was appointed to represent Kean.  Mr. Bush represented him at the preliminary examination. However, subsequently, Kean sent several letters to the trial court, expressing his dissatisfaction with Mr. Bush's representation.  Mr. Bush then filed a motion to withdraw, and, with Kean in agreement, on December 13, 2004, the trial court granted the motion.

The next day, Attorney James Piazza was appointed to represent Kean.  Kean said he sought out Mr. Piazza to represent him even before that appointment.  Nonetheless, about five weeks later, after several communications and meetings with Mr. Piazza, Kean complained to him, and to the trial court, about his representation.  Mr. Piazza also filed a motion to withdraw as counsel, and, on February 28, 2005, the motion was granted.

Following, in March 2005, Attorney Jeffrey Rupp was appointed to represent Kean. Mr. Rupp continued to represent him throughout the trial.

In April 2005, Kean was referred to the Center for Forensic Psychiatry for a competency and criminal responsibility evaluation.  The evaluating psychologist who examined him found that he was both competent and criminally responsible.

2

Kean's trial began on June 15, 2005.  The prosecution presented testimony from a number of witnesses, including the bank teller and the responding police officers.  Over thirty exhibits were introduced, including Kean's videotaped confession, photographs of him at the bank, his truck, and various items found in the truck, including the bundles of cash from the bank.

Melissa Ann Bauer was first to testify.  Ms. Bauer testified that, at the time of the incident, she was a bank teller at the bank where the robbery occurred.  According to Ms. Bauer, Kean entered  the bank and handed her a note, demanding cash.  The robbery was caught on the bank cameras.  Those photographs were presented to the jury.  Kean was identified as the individual in those photographs.  Ms. Bauer further testified that when she handed Kean the bundle of bills, she included in that bundle a dye pack.  The dye was automatically released by sensors as Kean went through the bank doors.

Ms. Bauer testified that, as soon as Kean left, she hit an alarm button, which alerted the police.  Subsequently, she said that central dispatch contacted the bank. The police were also advised of the robbery via radio transmissions.

There was also testimony that, as Kean ran from the bank, he threw the bundle containing the dye pack in an alley next to the bank.  A group of women in a passing van watched him run from the bank to a black truck.  The women in the van called 911.  At the direction of central dispatch and the police, they followed him, "flying behind him."  (Trial Tr. vol. II, 12, June 16, 2005.)

The women in the van lost Kean, but a deputy in Genesee County heard the information and subsequently positioned himself for observation.  Upon observing the black truck with the plate matching the description of the robbery-get-away vehicle, the uniformed

3

deputy, in a marked car, began pursuit.  However, Kean continued his flight.  He was eventually apprehended, after he ran his truck off the road and took off on foot.  Various items, including cash from the bank robbery, were seized from his truck.

Toward the end of the second day of trial, after the prosecution had presented its case and rested, outside the presence of the jury, Kean was advised of his right to testify and indicated he understood those rights.  He responded as follows: "I wish to just only make a statement."  (Trial Tr. vol. II, 97, June 16, 2005.)  The trial judge explained to him that he either had to testify or not; he could not just make a statement.  Kean then indicated to the trial judge that he wanted the jury to know, "I've been denied the right to a defense."  (Trial Tr. vol. II, 97, June 16, 2005.)  He persisted, stating that he was denied his right to present a defense and continued to complain about his attorney.  The trial judge repeatedly asked him if he wanted to testify and he responded only with statements about wanting his rights.  The trial judge then advised Kean to sit down and told him that he would hold him in contempt if he did not comply; Kean continued to speak out of turn.

Following that colloquy, the trial judge advised Kean that he was in contempt.  The trial judge had him removed from the courtroom and stated that he would be brought back when he "simmers down."  (Trial Tr. vol. II, 100, June 16, 2005.)

Defense counsel then proceeded with his motion for directed verdict.  The motion was denied.  Kean was returned to the courtroom.

The trial judge then provided Kean with another opportunity as to whether he wished to testify; Kean again responded that he wanted his rights and indicated, "I've been denied my right to a defense, so why should I testify."  (Trial Tr. vol. II, 109-110, June 16, 2005.)

4

Then, before the jury returned to the courtroom, defense counsel motioned the court for a mistrial, on the basis of the testimony of Detective Robert Ruth. Detective Ruth interviewed Kean and testified regarding that interview, which was videotaped. In that interview, Kean referred to a time, "when I got out of – of jail last time," thereby indicating that he had committed prior bad acts. (Trial Tr. vol. II, 74, June 16, 2005.) The trial judge denied the motion.

Subsequently, Kean again blurted out a comment about his right to a defense. Again, the trial judge advised him to be quiet, to please not interrupt the proceedings, and to address the court through his attorney. Kean nevertheless claimed he wanted to know why he could not have a defense. His attorney responded and the bailiff then advised Kean to be quiet.

Kean, however, persisted in his comments about a defense, and the trial judge then had the jury held and asked him, "[W]hat evidence do you have?" (Trial Tr. vol. II, 113, June 16, 2005.) Kean indicated he had a mental breakdown and told the trial judge that he had said that from the beginning of his trial. The trial judge noted that Kean had been to the Forensic Center but was held competent to testify. The trial judge repeatedly advised Kean not to speak when the jury was brought in or he would be removed but Kean persisted in making comments about his right to present a defense.

Defense counsel then called Kean to the stand to testify. The trial judge repeatedly asked him to raise his right hand to be sworn, only to have him state that he wanted to testify, but only with other evidence. Kean refused to be sworn. The defense then rested.

On the third day of trial, Kean appeared in his orange jail clothes. The trial judge gave him an opportunity to put on his suit. Kean responded, "Why don't you give me an

5

opportunity to present my defense?"  (Trial Tr. vol. III, 3, June 17, 2005.)  A conversation about the suit and his defense ensued, with the trial judge pointing out that the trial was completed with his attorney ably representing him.  The trial judge then repeatedly advised Kean to take the opportunity to put on his suit; Kean repeatedly responded that he had a constitutional right to present witnesses and evidence.

When Kean would not cooperate with the request to put on his suit, the trial judge stated the jury should return.  Before that occurred however, defense counsel told the trial judge that Kean asked him to make a motion to withdraw, because he had not presented a defense.  The trial judge responded by explaining that Mr. Rupp was the third attorney appointed to represent him in this case and that he (Mr. Rupp) had done a very able job during trial, doing everything possible with the facts that had been presented.  The trial judge concluded that the withdrawal motion would not be granted.

Kean then began commenting on his attorneys and, when the trial judge tried to speak, Kean continued to interrupt.  The trial judge then asked the bailiff to put him back in lock up and advised him to calm down.  Kean responded with further comments.  The trial judge noted that he was "obviously [] trying to disrupt the Court."  (Trial Tr. vol. III, 6, June 17, 2005.)  The trial judge indicated he would not allow that type of behavior in the courtroom and would proceed to use duct tape, if necessary.

The court reconvened a short time later and Kean was brought in, still wearing his orange clothing.  The trial judge asked him, again, to put his suit on and Kean, again, began arguing about getting justice.  The trial judge, again, warned him that if he disrupted the proceedings after the jury was brought in, he would be duct taped.  Kean responded, "You do that now, sir, do that now."  (Trial Tr. vol. III, 8, June 17, 2005.)  The trial judge

6

advised him that he did not want to do it and Kean then responded that he wanted the jury to know how he was being treated. Between Kean's ongoing and repeated interruptions, the trial judge pleaded with and warned him many more times not to be disruptive.

However, when the jury entered the courtroom, Kean immediately burst out with a statement addressing them, "Ladies and gentlemen of the jury, I want you all to know that I'm not being allowed to present my defense." (Trial Tr. vol. III, 10, June 17, 2005.) The trial judge, again, asked Kean to please be seated; Kean blurted out, "I have witnesses." *Id.* Only then did the trial judge request that he be duct taped. Kean continued his outburst before being duct taped.

Subsequently, the trial judge immediately provided a cautionary instruction to the jury, explaining that Kean would not be allowed to disrupt the court and that the case would continue. The trial judge also instructed them not to take into consideration what was occurring with Kean in the courtroom.

The prosecution then proceeded with his closing argument, followed by defense counsel's closing. In rebuttal, the prosecutor suggested that Kean's actions in the courtroom were a distraction. When the defense objected, the trial judge sustained the objection. The prosecutor then concluded.

Afterward, the trial judge proceeded with another cautionary instruction to the jury, stating that its decision must be based upon the evidence presented and not upon any disruptions in the courtroom or any steps taken by him to maintain proper decorum in the courtroom. The trial judge then read the standard jury instructions to the jury, along with the necessary instructions for the elements of the crimes for which Kean was charged.

7

After the instructions were complete and the jury was excused, defense counsel moved for a mistrial, based upon the prosecutor's comments in closing, referring to Kean's behavior.   In denying the motion, the trial judge noted he had provided cautionary instructions to the jury several times.

The jury found Kean guilty of bank robbery and fleeing and eluding but found him not guilty of armed robbery.

### III.  PROCEDURAL FACTS

Following his sentencing, Kean requested appellate counsel, which was assigned on August 1, 2005.  Subsequently, appellate counsel filed a motion for a new trial and for resentencing in the trial court, which was denied.  A motion for reconsideration of that decision was also denied.  Appellate counsel then filed a motion to withdraw, which was granted.  New appellate counsel was assigned on March 13, 2006.

Subsequently, Kean, through his new appellate counsel, filed an appeal of right in the Michigan Court of Appeals, raising the following claims:

I.      [Petitioner] was deprived of his right to due process when the court unnecessarily shackled him and wrapped duct tape around his head an*d over his mouth* in front of the jury, his counsel was ineffective for remaining silent during and after the shackling and gagging, he's entitled to a new trial.

II.     [Petitioner] is entitled to a new trial because he was deprived of his constitutional right to counsel when his attorney failed to present a defense to the top charge of bank robbery.

III.    [Petitioner] is entitled for an additional three days of credit against his sentence for the time he spent in custody in the hospital.

Kean also filed a *pro per* supplemental brief, raising additional claims; Kean alleged (1) that trial counsel was ineffective, (2) that the trial court failed to conduct an inquiry

8

regarding their ineffectiveness, thereby violating his rights to a fair trial, (3) prosecutorial misconduct, (4) additional sentencing errors, (5) trial court error in denying his motion for directed verdict, (6) ineffective assistance of trial counsel for failing to file a motion to quash the armed-robbery charge, (7) improper venue, and (8) cumulative errors.

On April 26, 2007, in an unpublished *per curiam* opinion, the Michigan Court of Appeals affirmed Kean's bank-robbery conviction, vacated his fleeing-and-eluding conviction, and remanded for resentencing. *People v. Kean*, No. 264236, 2007 WL 1224022 (Mich.Ct.App. Apr. 26, 2007). Subsequently, he filed an application for leave to appeal that decision in the Michigan Supreme Court, raising the same claims. The Michigan Supreme Court denied the application on September 24, 2007. *People v. Kean*, 480 Mich. 890, 738 N.W.2d 714 (2007).

Kean neither filed a writ of certiorari in the United States Supreme Court nor a post-conviction motion, pursuant to Mich.Ct.R. 6.500 *et. seq.*, in the state trial court.

Rather, on October 30, 2007, Kean filed this habeas petition, raising the following ineffective assistance of trial counsel claims: counsel was ineffective for failing to present an insanity defense, for conceding his guilt, and for failing to object when he appeared before the jury in shackles and was duct taped.

## IV.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this Court's habeas corpus review of state-court decisions. Specifically, 28 U.S.C. § 2254(d) states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court

9

proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

Under (d)(1), a federal court may grant a writ of habeas corpus under two different clauses, both of which provide two bases for relief. Under the "contrary to" clause, a federal court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The words "contrary to" should be construed to mean "diametrically different, opposite in character or nature, or mutually opposed." *Id.*

Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts. *Williams*, 529 U.S. at 407-08. Relief is also available under this clause if the state court decision either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.*, at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state court decision was "objectively unreasonable" and not simply erroneous or incorrect. *Williams*, 529 U.S. at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

In analyzing whether a state court decision is "contrary to" or an "unreasonable

10

application" of clearly established Supreme Court precedent, a federal court may only look to the holdings, as opposed to dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, 529 U.S. at 412.

## V.  DISCUSSION

### A.  Ineffective assistance of counsel claim–failure to present an insanity defense

As an initial matter, the Court notes that Kean's second, third and fourth claims were fairly presented to the state courts during his appeal of right.  However, it appears that his first claim, which asserts that he was denied the effective assistance of counsel because counsel failed to raise an insanity defense at trial, does not appear to have been presented to the state courts in his appeal of right.  Rather, Kean's counsel presented an ineffective assistance claim based on a different predicate, which now forms his second claim.  Kean presented a fairly vague issue in his supplemental brief, but this particular allegation was not made.  Accordingly, to the extent he is altering the factual basis for his ineffective assistance claim to one that was not presented to the state courts, the claim has not been exhausted.  *Lyons v Stovall*, 188 F.3d 327, 332 (6th Cir. 1999) (claim not exhausted where Petitioner alters the legal basis for his argument).  However, the Court concludes that exhaustion would be futile and therefore addresses this issue rather than requiring further proceedings in the state courts.

The federal habeas statute provides, in relevant part, that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]"  28 U.S.C. § 2254(b)(1)(A).  Thus, "[f]ederal

11

habeas relief is available to state prisoners only after they have exhausted their claims in state court." *O'Sullivan v. Boerckel*, 526 U.S. 838, 839 (1999).   A petitioner has not exhausted his remedies "if he has the right under the law of the State to raise, by any available procedure, the question presented."   28 U.S.C. § 2254(c).   To satisfy the exhaustion requirement, a petitioner "must have 'fairly presented' the substance of each of his federal constitutional claims to the state courts." *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004) (quoting *Hannah v. Conley*, 49 F.3d 1193, 1196 (6th Cir. 1995)).   A petitioner "fairly presents" his claim to the state courts by either (1) relying upon federal cases employing federal constitutional analysis; (2) relying upon state cases employing such an analysis; (3) phrasing the claim in terms of federal constitutional law; or (4) alleging facts within the mainstream of federal constitutional law.   *See Clinkscale*, 375 F.3d at 437 (quoting *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003)).   Further, the petitioner must fairly present the claim at each level of state-court review.   *See O'Sullivan*, 526 U.S. at 845-47.

Exhaustion is not required only if "(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant."   28 U.S.C. § 2254(b)(1)(B).   A "mixed petition," that is a petition which contains both exhausted and unexhausted claims, must be treated as unexhausted in its entirety.   *See Rose v. Lundy*, 455 U.S. 509, 522 (1982).   A federal habeas court has no authority to grant relief on even an exhausted claim where the petition also contains unexhausted claims.   *See Rockwell v. Yukins*, 217 F.3d 421, 424 (6th Cir. 2000).

Here, there is no question that this claim is unexhausted.   The Court will nevertheless address the claim on its merits.   Despite the exhaustion requirement, a

habeas petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). Thus, a federal court may decide a habeas petition on the merits when the grounds for relief are without merit or are not cognizable on habeas review. *See Cain v. Redman*, 947 F.2d 817, 820 (6th Cir. 1991); *Prather v. Rees*, 822 F.2d 1418, 1421-22 (6th Cir. 1987). In this case, the Court will dismiss this claim on its merits to save the state courts the useless review of a meritless constitutional claim. *See Cain*, 947 F.2d at 820. Further, requiring exhaustion at this point raises difficult procedural questions concerning the interplay between the exhaustion requirement and the statute of limitations governing habeas petitions. *See generally Rhines v. Weber*, 544 U.S. 269 (2005). Because, as discussed below, Kean is not entitled to relief on any of his claims, the Court dismisses this claim on the merits rather than require further review in the state courts.

In *Strickland v Washington*, 466 U.S. 668 (1984), the Supreme Court adopted a two-prong test for determining whether a petitioner received adequate assistance of counsel. First, a petitioner must show that his counsel's representation fell below an objective standard of reasonableness. *Id.* at 687-691. Second, the petitioner must show that there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. "With regard to the performance prong of the inquiry, . . . [j]udicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir), *cert. denied*, 121 S.Ct. 623 (2000) (quoting

13

*Strickland*, 466 U.S. at 689).  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  The petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* 466 U.S. at 689.

Here, Kean cannot established that defense counsel's performance was deficient.  The record reveals that counsel was well aware of his mental health issues and that he requested a competency and criminal responsibility evaluation before trial.  After reviewing that evaluation, which found Kean competent and criminally responsible for his actions, counsel reasonably determined that Kean was competent, and determined that, most likely, an insanity defense would be unsuccessful at trial.

Under Michigan law, a criminal defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence.  To establish such a defense, the defendant must show that, at the time of the offense, he had a mental illness or was mentally retarded and that, as a result, he lacked the substantial capacity either to appreciate the nature and quality or the wrongfulness of his conduct or conform his conduct to the requirements of the law.  *See* MICH. COMP. LAWS § 768.21a; *People v. Carpenter*, 464 Mich. 223, 230-31, 627 N.W.2d 276 (2001).  There is no evidence in the record which demonstrates that Kean was experiencing depression or mental illness symptoms, other than his claim that he was, which prevented him from understanding the nature or wrongfulness of his conduct or from conforming his conduct to the law.  Kean has not submitted reports which indicate that an insanity defense was viable or would have prevailed at trial.  The mere fact that he may suffer from depression or other mental health

14

problems does not mean that he was legally insane at the time of the offense.

Moreover, as one court has noted: "[T]here is considerable empirical evidence that insanity pleas in and of themselves are not received favorably by jurors." *Weekley v. Jones*, 76 F.3d 1459, 1463 (8th Cir. 1996) (referencing legal journal). Since insanity-type defenses are rarely successful, it was not unreasonable for counsel, under the facts of this case, to forego such a defense for a more plausible defense theory. *See*, e.g., *Silva v. Woodford*, 279 F.3d 825, 851 (9th Cir. 2002).

Against that backdrop, the Court concludes that Kean has failed to show that trial counsel erred in failing to raise an insanity defense. The fact that trial counsel's strategy was ultimately unsuccessful does not mean that counsel was ineffective. *See Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) ("an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken") (citing *Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001). Kean therefore cannot demonstrate that trial counsel was ineffective under the standard set forth in *Strickland*, *supra*, nor has he shown that he was deprived of a substantial defense. Habeas relief is not warranted on this claim.

## B. Ineffective assistance of counsel claim

### 1. Conceding Petitioner's guilt to bank robbery

In his second claim, Kean alleges that trial counsel was ineffective for conceding his guilt to bank robbery and only contesting the armed-robbery charge. The Court of Appeals denied this claim on the merits, stating:

> This Court has explained that a complete concession of a defendant's guilt without the defendant's consent renders counsel ineffective. However, it is acceptable trial strategy to admit to offenses where the evidence strongly

15

establishes guilt, while at the same time denying other elements or other crimes. Defendant was charged with armed robbery in violation of MCL 750.529. Armed robbery is a class A felony. Defendant was also charged with bank robbery in violation of MCL 750.531. Bank robbery is a class C felony. While both offenses provide for a statutory maximum term of imprisonment of life, the sentencing guidelines provide a lesser recommended minimum term of imprisonment at every point in the sentencing grid for class C felonies than for class A felonies. Indeed, defendant's minimum sentence, enhanced for his habitual offender status, of 102 months for bank robbery is a full two years less than the guidelines recommended minimum sentence for an offender convicted of armed robbery having defendant's total guidelines score before any enhancement for habitual offender status.

Thus, contrary to defendant's assertion, defense counsel did not concede defendant's guilt to the most serious or "highest" charge against him. Rather, defense counsel conceded that which defendant himself had already admitted to police-that he robbed the bank and then attempted to flee and elude police-while challenging the prosecution's allegation that defendant was armed during the robbery. As this Court has explained, "[w]here the evidence obviously points to defendant's guilt, it can be better tactically to admit to the guilt and assert a defense or admit to guilt on some charges but maintain innocence on others." Simply stated, it is not ineffective assistance of counsel for defense counsel to concede lesser crimes in hopes of avoiding a finding of guilt on greater ones.

Defendant argues that his counsel's tactic cannot be explained as legitimate trial strategy. However, defense counsel's concession that defendant robbed the bank, in light of the overwhelming evidence including defendant's own statement that he did so and pictures showing him doing so, merely confirmed the inescapable conclusion that he did so. Defense counsel's strategy was to attempt to steer the jury away from the most serious of possible verdicts against defendant: guilty of armed robbery. This Court has consistently held that counsel's strategy of admitting defendant's guilt on some elements or crimes that the evidence strongly supports, while denying others, does not necessarily render ineffective assistance. As this Court explained in *Wise*:

> Legitimate trial strategy will not be second-guessed. Accordingly, arguing that the defendant is merely guilty of the lesser offense is not ineffective assistance of counsel. Where defense counsel in opening statement recognizes and candidly asserts the inevitable, he is often serving his client's interests best by bringing out the damaging information and thus lessening the impact. In light of defendant's confession to the

16

> police that he had committed [certain of the charged offenses]
> defendant's credibility would have been lost if he had testified
> denying any involvement at all . . . .  In fact, [counsel's strategy]
> was somewhat successful.  Defendant was acquitted of four of
> the seven charges.
>
> Here, counsel's strategy likewise was successful: defendant was
> acquitted of armed robbery and thus avoided a longer sentence than that
> imposed for his bank robbery conviction.   This Court should not
> second-guess trial counsel's tactic of admitting guilt to a lesser offense.
>
> Further, even were this Court to disapprove of defense counsel's
> strategy of essentially admitting that defendant committed the bank robbery,
> given the overwhelming evidence against him, defendant cannot establish
> that but for counsel's mistake there is a reasonable probability that the results
> of his trial would have been different, and that the proceedings were
> fundamentally unfair or unreliable.  Therefore, defendant's claim lacks merit.

*Kean*, No. 264236, 2007 WL 1224022, at *4-5 (citations and footnote omitted).

In this case, the Court finds that the Michigan Court of Appeals' decision was not

contrary to, or an unreasonable application of, clearly established Supreme Court

precedent.  Kean was caught red-handed after the bank robbery and he admitted to police

that he had robbed the bank.  The only reasonably disputed issue at trial was whether he

was armed or not when he committed the robbery.  It was a reasonable strategic decision

for counsel to concede the obvious, gain credibility by his concession, and then attack the

weak point of the prosecutor's case.  Indeed, the strategy worked as Kean was acquitted

of armed robbery.  As noted by the Court of Appeals, a conviction for armed robbery would

have carried with it the likelihood of a more severe sentence.

Moreover, given the evidence produced at trial, the Court of Appeals reasonably

concluded that counsel's decision to concede that Kean robbed the bank was sound trial

strategy.  Kean therefore cannot demonstrate that trial counsel was ineffective under the

standard set forth in *Strickland*, *supra*.  He therefore is not entitled to habeas relief on this

17

claim.

## 2. Failing to object to Petitioner being gagged and shackled

In his third and fourth habeas claims, Kean asserts that he was denied a fair trial when he was gagged with duct tape and allegedly placed in shackles during a portion of his trial, and his trial counsel failed to object. The Court of Appeals rejected this claim in light of the trial record, which demonstrated that Kean's conduct continued after numerous warnings, and thus, the measures taken by the trial court were justified. In addressing the claim, the Court of Appeals stated:

> Here, the trial court had removed defendant from the courtroom on two occasions and had advised defendant that he was in contempt of court. Only after defendant continued his outbursts despite theses actions, did the trial court first warn him that it would place duct tape over his mouth if he persisted in his comments in the presence of the jury. Defendant acknowledged the warning and actually invited the trial court to tape his mouth before the jury entered the courtroom. The trial court declined, indicating that it did not want to have to tape defendant's mouth at all, and again instructed defendant to maintain proper decorum in front of the jury. Defendant was aware of the consequences of his continued refusal to comply with the trial court's instructions that he remain quiet. Yet, despite being advised by the court of those consequences, defendant addressed the jury directly and inappropriately until he was rendered incapable of doing so by duct tape. As a panel of this Court observed in *People v. Martin*, unpublished opinion *per curiam* of the Court of Appeals, issued June 14, 2005 (Docket No. 255869), "[g]iven defendant's complete lack of cooperation, it was appropriate for the court to take some sort of action to maintain control of the proceedings." Having already advised defendant that he was in contempt, and having already removed him from the proceedings on two separate occasions, the trial court finally resorted to taping defendant's mouth to prevent further outbursts in order to allow defendant's trial to conclude. Considering defendant's awareness of the consequences of his continued outbursts and in light of his persistent and deliberate conduct thereafter, we do not conclude that the trial court abused its discretion in ordering duct tape placed over defendant's mouth.

*Kean*, No. 264236, 2007 WL 1224022, at * 3.

In *Deck v. Missouri*,544 U.S. 622 (2005), the Supreme Court held that shackling a

18

criminal Petitioner is unconstitutional in the absence of a special need to do so.  *Id.* at 626.

The opinion then noted the origins of the rule against shackling in the commentaries of

Blackstone, treatises, and the decisions of numerous lower courts, both state and federal.

The Court's citation to secondary sources was followed by this observation:

> More recently, this Court has suggested that a version of this rule forms part of the Fifth and Fourteenth Amendments' due process guarantee. Thirty-five years ago, when considering the trial of an unusually obstreperous criminal Petitioner, the Court held that the Constitution sometimes permitted special measures, including physical restraints. *Allen*, 397 US, at 343-344, 25 LEd2d 353, 90 SCt 1057.  The Court wrote that "binding and gagging might possibly be the fairest and most reasonable way to handle" such a Petitioner.  *Id.*, at 344, 25 LEd2d 353, 90 SCt 1057.  But the Court immediately added that "even to contemplate such a technique . . . arouses a feeling that no person should be tried while shackled and gagged except as a last resort."  *Ibid.*
>
> Sixteen years later, the Court considered a special courtroom security arrangement that involved having uniformed security personnel sit in the first row of the courtroom's spectator section.  The Court held that the Constitution allowed the arrangement, stating that the deployment of security personnel during trial is not "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial."  *Holbrook*, 475 US, at 568-569, 89 LEd2d 525, 106 S Ct. 1340.  *See also Estelle v Williams*, 425 US 501, 503, 48 L Ed 2d 126, 96 S Ct 1691 (1976) (making a Petitioner appear in prison garb poses such a threat to the "fairness of the factfinding process" that it must be justified by an "essential state policy").
>
> Lower courts have treated these statements as setting forth a constitutional standard that embodies Blackstone's rule.  Courts and commentators share close to a consensus that, during the guilt phase of a trial, a criminal defendant has a right to remain free of physical restraints that are visible to the jury; that the right has a constitutional dimension; but that the right may be overcome in a particular instance by essential state interests such as physical security, escape prevention, or courtroom decorum.
>
> * * *
>
> [I]n light of this precedent, and of a lower court consensus disapproving routine shackling dating back to the 19th century, it is clear that this Court's prior statements gave voice to a principle deeply embedded in

19

the law. We now conclude that those statements identify a basic element of the "due process of law" protected by the Federal Constitution. Thus, the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Deck*, 544 U.S. at 627-29 (some citations omitted).

And, in *Illinois v. Allen*, 397 U.S. 337, 343-44 (1970), the Supreme Court stated:

It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly.

In this case, the Court finds that the Court of Appeals did not unreasonably apply these established principles. Given Kean's complete lack of cooperation, it was appropriate for the trial court to take some sort of action to maintain control of the proceedings. Furthermore, Kean repeatedly interrupted the court on the second day of trial after the close of the prosecutor's case. The trial judge repeatedly warned him not to speak out of turn in front of the jury, threatened to hold him in contempt, and asked him to speak through his attorney. Nonetheless, the trial judge did allow Kean to make a statement about any evidence or defense he had, with Kean claiming he had a mental breakdown.

Despite numerous attempts to allow Kean to testify, he refused to do so, claiming he would incriminate himself without other evidence. The trial judge made numerous

20

attempts to reason with Kean and to let him calm down. However, Kean repeatedly interrupted the trial judge with statements like, "Why don't you give me an opportunity to present my defense?" (Trial Tr. vol. III, 3-4, June 17, 2005.) The trial judge, repeatedly, warned Kean that, if he disrupted proceedings again, after the jury was brought in, he would be duct taped. The trial judge advised him that he did not want to do it and Kean responded that he wanted the jury to know how he was being treated. Between Kean's ongoing and repeated interruptions, the trial judge pleaded with and warned him, about ten times, not to be disruptive. When the jury entered the courtroom, Kean immediately burst out with a statement addressing them and indicating that he was not being allowed to present his defense. The trial judge asked him, again, to please be seated and Kean, again, blurted out "I have witnesses." (Trial Tr. vol. III, 10, June 17, 2005.) Only then did the trial judge request that Kean be duct taped. Kean continued his outburst before being duct taped.

After Kean was duct taped, the trial judge immediately provided a cautionary instruction to the jury explaining they should not to take into consideration what was occurring with him in the courtroom. And, after the closing arguments, the trial judge immediately proceeded with another cautionary instruction to the jury that its decision must be based upon the evidence and not upon any disruptions in the courtroom or any steps taken by the trial judge to maintain proper decorum in the courtroom. On that basis, the Court finds that the Court of Appeals' decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Kean therefore cannot demonstrate that trial counsel was ineffective under the standard set forth in *Strickland*, *supra*.

21

Moreover, even if the Court were to finds error, the existence of the overwhelming evidence establishing Kean's guilt, including a videotape of the incident, renders any error harmless. *See Lakin v. Stine*, 431 F.3d 959, 966 (6th Cir. 2005), *cert. denied*, 547 U.S. 1118 (2006). "Errors resulting from the use of physical restraints are subject to harmless error analysis." *King v. White*, 839 F.Supp. 718, 726 (C.D. Cal. 1993) (citing *Castillo v. Stainer*, 983 F.2d 145, 147 (9th Cir. 1992) (holding that, where the petitioner was not "bound and gagged or forced to wear prison clothes or medicated" against his will, an error in restraining him or her is subject to harmless error analysis); *see also Ruimveld v. Birkett*, 404 F.3d 1006, 1013 (6th Cir. 2005) (stating that "there does not appear to be a clearly announced rule, in a Supreme Court holding, that harmless error analysis should not be applied to shackling [and gagging] cases").

Additionally, regarding Kean's claim that the jury saw him in shackles, the record does not reflect that he was in shackles, and, even if he was, it does not reflect that they were visible to the jury. Absent evidence that jury members actually saw Kean in shackles, he cannot demonstrate a constitutional violation. Furthermore, even if the jurors had seen him in shackles, the Supreme Court has not held that a defendant's constitutional rights are automatically violated when jurors see shackles on a defendant. *Mendoza v. Berghuis*, 544 F.3d 650, 655-56 (6th Cir. 2008). To the contrary, each case is evaluated on a case by case basis. Therefore, the underlying facts in this case or, more aptly, the lack thereof relative to Kean's claim do not lend themselves to habeas relief.

Against that backdrop, upon a consideration of all the facts and circumstances, including the trial judge's repeated and clear instructions to the jury about basing its decision only upon the evidence, the Court concludes that the Court of Appeals' decision,

22

rejecting these claims, was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent; defense counsel's handling of the matter did not amount to ineffective assistance.  Kean is therefore not entitled to habeas relief.

## C.  Certificate of Appealability

A petitioner must receive a certificate of appealability ("COA") in order to appeal the denial of a habeas petition for relief from either a state or federal conviction.  28 U.S.C. §§ 2253(c)(1)(A), (B).  A district court, in its discretion, may decide whether to issue a COA at the time the court rules on a petition for a writ of habeas corpus or may wait until a notice of appeal is filed to make such a determination.  *See Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2002); *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1072 (6th Cir. 1997), *overruled in part on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997). In denying the habeas petition, the Court has studied the case record and the relevant law, and concludes that, as a result, it is presently in the best position to decide whether to issue a COA.  *See Castro*, 310 F.3d at 901 (quoting *Lyons*, 105 F.3d at 1072) (a district judge who has just denied a habeas petition has knowledge of both the record and the relevant law and is often best able to determine whether to issue the COA).

A court may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a federal district court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed

23

further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims.  *Id.* at 336-37.  When a federal district court denies a habeas claim on procedural grounds without addressing the merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.  *See Slack*, 529 U.S. at 484-85.

The Court therefore concludes that jurists of reason would not find its assessment of the constitutional claim debatable or wrong.  The Court thus declines to issue Kean a certificate of appealability.  Nor should he be granted leave to proceed on appeal *in forma pauperis*, as any appeal would be frivolous.  *See* Fed. R. App. P. 24(a).

## VI.  Conclusion

For the reasons stated above, this Court concludes that Petitioner Kean is not entitled to federal habeas relief on the claims presented in his petition.

Accordingly, **IT IS ORDERED** that the "Petition for Writ of Habeas Corpus" is **DENIED WITH PREJUDICE**.  (Dkt. # 1.)

**IT IS FURTHER ORDERED** that the Court declines to issue a certificate of appealability and leave to proceed on appeal *in forma pauperis*.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

24

Dated:  November 20, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 20, 2009, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager